# 18-2990(L)

## 18-3710(CON), 18-3712(CON), 18-3715(CON), 18-3850(CON), 19-1272(CON)

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

◆◆

UNITED STATES OF AMERICA,

*Appellee,*

—against—

JOSEPH PERCOCO, STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI, ALAIN KALOYEROS, AKA DR. K,

*Defendants-Appellants,*

PETER GALBRAITH KELLY, JR., MICHAEL LAIPPLE, KEVIN SCHULER,

*Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT BRIEF ON REMAND OF DEFENDANTS-APPELLANTS STEVEN AIELLO, JOSEPH GERARDI, LOUIS CIMINELLI AND ALAIN KALOYEROS

ALEXANDRA A.E. SHAPIRO
DANIEL J. O'NEILL
FABIEN M. THAYAMBALLI
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants
Steven Aiello and Joseph Gerardi*

TIMOTHY W. HOOVER
SPENCER L. DURLAND
HOOVER & DURLAND LLP
561 Franklin Street
Buffalo, New York 14202
(716) 800-2600

HERBERT L. GREENMAN
LIPSITZ GREEN SCIME CAMBRIA LLP
42 Delaware Avenue, Suite 300
Buffalo, New York 14202
(716) 849-1333

*Attorneys for Defendant-Appellant
Louis Ciminelli*

(*Counsel continued on inside cover*)

MICHAEL C. MILLER
REID H. WEINGARTEN
MICHAEL G. SCAVELLI
STEPTOE & JOHNSON LLP
1114 Avenue of the Americas
New York, New York 10036
(212) 506-3900

BRUCE C. BISHOP
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 429-6747

*Attorneys for Defendant-Appellant
    Alain Kaloyeros*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................... 1

SUPPLEMENTAL STATEMENT OF THE CASE ............................... 2

    A.   The Supreme Court Rejected The Right-To-Control Theory Underlying Defendants' Wire Fraud And Conspiracy Convictions .......... 2

    B.   The Supreme Court Rejected The Government's Attempt To Rely On A Traditional Fraud Theory ....................................................... 3

    C.   The Supreme Court Rejected The Theory Underlying Aiello's Conviction For Honest Services Fraud, Which The Government Agrees Should Be Vacated So That It Can Dismiss That Charge ............ 8

ARGUMENT ......................................................................................... 8

I.    DEFENDANTS ARE ENTITLED TO JUDGMENTS OF ACQUITTAL ....... 8

    A.   Acquittal Is Required Because The Government Did Not Present Any Legally Valid Theory At Trial ........................................................... 9

        1.   Sufficiency Review Cannot Look Beyond The Theory Charged In The Indictment And Presented At Trial ...................... 9

        2.   Defendants Are Entitled To Acquittal ........................................... 15

    B.   The Evidence Is Insufficient Even If Measured Under A Traditional Property Fraud Theory ........................................................... 18

        1.   Wire Fraud Requires Proof That The Defendant Intended To Inflict Economic Harm ........................................................... 19

        2.   There Was No Evidence That Defendants Intended Harm To Fort Schuyler's Property Interests .......................................... 25

3.    The Theoretical Possibility That Fort Schuyler Could
       Have Gotten A Better Deal Is Insufficient To Establish
       A Wire Fraud Scheme ................................................... 29

II.   GERARDI'S FALSE STATEMENT CONVICTION SHOULD BE
       REVERSED .................................................................... 32

     A.   Background ................................................................. 33

     B.   *Ciminelli* Renders Gerardi's Statements Immaterial ............... 35

     C.   At A Minimum, Spillover Prejudice From The Wire Fraud
          And Conspiracy Counts Requires Vacating The § 1001 Conviction ....... 37

CONCLUSION ................................................................... 43

# TABLE OF AUTHORITIES

**Cases**                                         **Page(s)**

*Abraham Zion Corp. v. Lebow*,
  761 F.2d 93 (2d Cir. 1985) ................................28

*Aiello v. United States*,
  143 S. Ct. 2491 (2023) ................................7, 8

*Aramony v. United Way of Am.*,
  254 F.3d 403 (2d Cir. 2001) ................................28

*Bullington v. Missouri*,
  451 U.S. 430 (1981) ................................17

*Burks v. United States*,
  437 U.S. 1 (1978) ................................ 10, 16, 17, 43

*Chiarella v. United States*,
  445 U.S. 222 (1980) ................................ 4, 12

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ................................ passim

*Dunn v. United States*,
  442 U.S. 100 (1979) ................................13

*Eaton v. City of Tulsa*,
  415 U.S. 697 (1974) ................................13

*Genovese Drug Stores, Inc. v. Conn. Packing Co.*,
  732 F.2d 286 (2d Cir. 1984) ................................28

*Hammerschmidt v. United States*,
  265 U.S. 182 (1924) ................................24

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ................................ 9, 10

*Johnson v. Zerbst*,
  304 U.S. 458 (1938) ................................17

*Kaloyeros v. United States*,
143 S. Ct. 2490 (2023) ....................................................7

*Kelly v. United States*,
140 S. Ct. 1565 (2020) ............................. 9, 15, 18, 23, 31

*Kungys v. United States*,
485 U.S. 759 (1988) ......................................................36

*Lockhart v. Nelson*,
488 U.S. 33 (1988) ........................................................10

*McCormick v. United States*,
500 U.S. 257 (1991) ........................................................4

*Musacchio v. United States*,
577 U.S. 237 (2016) ......................................................14

*Pasquantino v. United States*,
544 U.S. 349 (2005) ......................................................23

*Percoco v. United States*,
598 U.S. 319 (2023) ........................................................8

*Russell v. United States*,
369 U.S. 749 (1962) ......................................................12

*Skilling v. United States*,
561 U.S. 358 (2010) ......................................................23

*Stirone v. United States*,
361 U.S. 212 (1960). ....................................................12

*United States v. Abdelaziz*,
68 F.4th 1 (1st Cir. 2023) ............................................41

*United States v. Aleynikov*,
676 F.3d 71 (2d Cir. 2012) ..........................................13

*United States v. Aleynikov*,
No. 10-cr-96 (DLC), ECF No. 164 (S.D.N.Y. June 5, 2012) ............................14

- iv -

*United States v. Bonds*,
784 F.3d 582 (9th Cir. 2015) ................................................................37

*United States v. Bouchard*,
828 F.3d 116 (2d Cir. 2016) ................................................................12

*United States v. Bruno*,
383 F.3d 65 (2d Cir. 2004) ........................................... 37, 38, 40, 41

*United States v. Concepcion*,
983 F.2d 369 (2d Cir. 1992) ................................................................13

*United States v. Coplan*,
703 F.3d 46 (2d Cir. 2012) ................................................................32

*United States v. D'Amato*,
39 F.3d 1249 (2d Cir. 1994) ................................................................31

*United States v. Facchini*,
874 F.2d 638 (9th Cir. 1989) ................................................................36

*United States v. Finazzo*,
850 F.3d 94 (2d Cir. 2017) ................................................................30

*United States v. Frampton*,
382 F.3d 213 (2d Cir. 2004) ........................................................ 10, 11

*United States v. Gaudin*,
515 U.S. 506 (1995) ................................................................35

*United States v. Gonzales*,
841 F.3d 339 (5th Cir. 2016) ................................................................11

*United States v. Guadagna*,
183 F.3d 122 (2d Cir. 1999) ........................................................ 18, 31

*United States v. Guertin*,
67 F.4th 445 (D.C. Cir. 2023) ................................................................24

*United States v. Hamdi*,
432 F.3d 115 (2d Cir. 2005) ................................................................28

*United States v. Ismail,*
    97 F.3d 50 (4th Cir. 1996) .....................................................................36

*United States v. Johnson,*
    19 F.4th 248 (3d Cir. 2021) ...................................................................35

*United States v. Kwong,*
    14 F.3d 189 (2d Cir. 1994) ....................................................................31

*United States v. Labat,*
    905 F.2d 18 (2d Cir. 1990) ....................................................................12

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015) ............................................................ 35, 36

*United States v. Mancuso,*
    485 F.2d 275 (2d Cir. 1973) ..................................................................37

*United States v. Miller,*
    953 F.3d 1095 (9th Cir. 2020) ...............................................................24

*United States v. Mittelstaedt,*
    31 F.3d 1208 (2d Cir. 1994) ..................................................................22

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006) ..................................................... 22, 23, 32

*United States v. Olano,*
    507 U.S. 725 (1993) ..............................................................................17

*United States v. Parse,*
    789 F.3d 83 (2d Cir. 2015) ....................................................................18

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019) ..................................................................32

*United States v. Percoco,*
    13 F.4th 158 (2d Cir. 2021) ............................................................ passim

*United States v. Qaisi,*
    779 F.2d 346 (6th Cir. 1985) .................................................................36

*United States v. Regan*,
  937 F.2d 823 (2d Cir. 1991) .................................................................31

*United States v. Regent Office Supply Co.*,
  421 F.2d 1174 (2d Cir. 1970) ..................................................... passim

*United States v. Rigas*,
  490 F.3d 208 (2d Cir. 2007) .................................................................11

*United States v. Rooney*,
  37 F.3d 847 (2d Cir. 1994) ............................................. 37, 39, 40, 41

*United States v. Sadler*,
  750 F.3d 585 (6th Cir. 2014) ...............................................................24

*United States v. Schwartz*,
  924 F.2d 410 (2d Cir. 1991) ................................................................16

*United States v. Shellef*,
  507 F.3d 82 (2d Cir. 2007) ...................................................... 23, 24, 30

*United States v. Starr*,
  816 F.2d 94 (2d Cir. 1987) ....................................................... passim

*United States v. Takhalov*,
  827 F.3d 1307 (11th Cir. 2016) ...........................................................24

*United States v. Tellier*,
  83 F.3d 578 (2d Cir. 1996) ..................................................................40

*United States v. Wright*,
  665 F.3d 560 (3d Cir. 2012) ................................................................41

*Van Buren v. United States*,
  141 S. Ct. 1648 (2021) ........................................................................14

*Voisine v. United States*,
  579 U.S. 686 (2016) ............................................................................31

**Statutes**

18 U.S.C. § 1001 .............................................................. passim

18 U.S.C. § 1341 ...............................................................20

18 U.S.C. § 1343 ...............................................................7

## INTRODUCTION

This case was charged and tried on a single theory—that the Defendants schemed to defraud Fort Schuyler of its "right to control" its assets by depriving it of "potentially valuable economic information." The government *chose* not to pursue any other theory. It abandoned earlier indictments alleging a traditional theory of property fraud and replaced them with a second superseding indictment exclusively charging a "right to control" theory. Consequently, "right to control" was the sole theory on which the jury was instructed, and the sole theory on which its verdict could have rested.

But it was not a legally valid theory of wire fraud or wire fraud conspiracy. The Supreme Court unanimously held in *Ciminelli v. United States*, 598 U.S. 306 (2023), that the wire fraud statute reaches only "traditional property interests," and that the right to control one's assets is not one of them. The Court therefore reversed this Court's decision affirming Defendants' convictions. The Court held that, given the history of this prosecution and the government's exclusive reliance on the right-to-control theory, the convictions could not be affirmed under *any* theory.

"That should be the end of the case." *Id.* at 316. Under the controlling law, the required remedy on remand to this Court is a judgment of acquittal on the fraud counts.

Defendant Joseph Gerardi's false statement conviction should also be reversed. After *Ciminelli* his statements were immaterial, and extensive spillover prejudice from the proof relating to the fraud charges deprived him of a fair trial.

## SUPPLEMENTAL STATEMENT OF THE CASE

### A. The Supreme Court Rejected The Right-To-Control Theory Underlying Defendants' Wire Fraud And Conspiracy Convictions

The facts of this case are set forth in Defendants' prior briefs. In its earlier decision, this Court affirmed Defendants' convictions for wire fraud and wire fraud conspiracy. *United States v. Percoco*, 13 F.4th 158, 164 (2d Cir. 2021) ("*Percoco I*"). Central to the decision was the "right-to-control theory of wire fraud," long applied in this Circuit, which "allow[ed] for conviction on a showing that the defendant … deprived some person or entity of potentially valuable economic information." *Id.* at 170.[1] This Court held, among other things, that (1) the "evidence was []sufficient to support [Defendants'] convictions under a right-to-control theory," (2) the jury instructions correctly "explained the right-to-control theory," (3) the district court did not err in excluding defense evidence that was "not material" to "right-to-control wire fraud," and (4) the district court did not err

---

[1] Unless otherwise noted, citations omit internal citations, quotation marks, footnotes, and previous alterations, and emphasis is in the original source. "SAR" refers to Defendants' Supplemental Appendix on Remand; "A" and "SPA" refer to Defendants' original Appendix and Special Appendix, respectively; and "SA" refers to the government's Supplemental Appendix. "Dkt." refers to docket entries in *United States v. Percoco*, No. 18-2990(L).

in admitting government evidence that was "relevant under the right-to-control theory." *Id.* at 170, 175, 178.

Defendants petitioned for certiorari, seeking review of the legal validity of the right-to-control theory under the federal wire fraud statute. The Supreme Court granted Defendant Louis Ciminelli's petition.

In a 9-0 decision, the Supreme Court held that "the right-to-control theory is not a valid basis for liability." *Ciminelli v. United States*, 598 U.S. 306, 309 (2023). The Supreme Court explained that "[t]he right-to-control theory cannot be squared with the text of the federal fraud statutes," is "inconsistent with the[ir] structure and history," and "vastly expands federal jurisdiction without statutory authorization." *Id.* at 314-16. "[T]he wire fraud statute reaches only traditional property interests," and because "[t]he right to [potentially] valuable economic information … is not a traditional property interest," the "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id.* at 316.

## B. The Supreme Court Rejected The Government's Attempt To Rely On A Traditional Fraud Theory

The government itself abandoned the right-to-control doctrine during Supreme Court proceedings. "[D]espite relying upon the right-to-control theory for decades, including in this very case," the government switched course after the Supreme Court granted certiorari, and conceded that the right-to-control theory "is erroneous." *Ciminelli*, 598 U.S. at 315-16. "The Government frankly admit[ted]

3

that, 'to the extent that language in the [Second Circuit's] opinions might suggest that depriving a victim of economically valuable information, without more, necessarily qualifies as "obtaining money or property" within the meaning of the fraud statutes, that is incorrect.'" *Id.* at 316 (quoting Brief for the United States ("*Ciminelli* U.S. Br.") at 24). Nevertheless, the government urged the Supreme Court to "affirm [the] convictions on the alternative ground that the evidence was sufficient to establish wire fraud under a traditional property-fraud theory"— namely, that Defendants allegedly schemed to obtain hundreds of millions of dollars in contract revenue. *Id.*; *see also Ciminelli* U.S. Br., at 11, 13-15, 31-33.

The Supreme Court rejected that request because that was not the theory on which Defendants were indicted, tried, or convicted. "'Appellate courts are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury.'" *Ciminelli*, 598 U.S. at 317 (quoting *McCormick v. United States*, 500 U.S. 257, 270-71 n. 8 (1991), and citing *Chiarella v. United States*, 445 U.S. 222, 236 (1980)). The theory actually advanced by the government at trial and considered by the jury is what matters— not hypothetical theories the government could have charged and tried but did not. Here, the Supreme Court was unequivocal that the government "indict[ed], obtain[ed] convictions, and prevail[ed] on appeal based *solely* on the right-to-control theory." *Id.* at 316 (emphasis added).

4

In fact, as the Supreme Court explained, the government deliberately abandoned any traditional theory of wire fraud. As the Supreme Court observed, "[a]n earlier indictment alleged that the Buffalo Billion contracts were the property at issue. But, to defend against the defendants' motion to dismiss, the Government relied *solely* on the theory that the scheme 'defraud[ed] Fort Schuyler of its right to control its assets.'" *Id.* at 310 n.1 (emphasis added) (quoting final indictment). Specifically, the government obtained a second superseding indictment that jettisoned the earlier allegations and replaced them with the right-to-control theory. (*See* SAR-23-24, SAR-27 (redline comparison of S1 and S2 Indictments filed by the government)). As the government admitted, this provided an "easier route to prove to a jury" that Defendants should be convicted. (*Ciminelli* Oral Arg. Tr. 60). "The District Court then relied expressly on the right-to-control theory in denying the motion to dismiss." *Ciminelli*, 598 U.S. at 310 n.1; *see* SPA-14-15.

The Supreme Court also concluded that "[t]he Government's … trial strategy rested *solely* on [the right-to-control] theory." *Ciminelli*, 598 U.S. at 310 (emphasis added). Opposing a defense motion in limine challenging the government's theory of property, the government insisted that "[i]t is clear from the S2 Indictment and the Court's order [denying the motions to dismiss] that the property interest at issue was Fort Schuyler's right to control its own assets." (A845). When the trial court asked the government to clarify its theory, the

5

government submitted another letter reiterating its exclusive reliance on the right-to-control theory.  (A849-52).

This strategy won the government several courtroom advantages.  The prosecution argued repeatedly that because it was not pursuing a traditional fraud theory, it did not need to prove actual or intended financial or economic harm, only an intent to deprive Fort Schuyler of potentially valuable economic information. (*E.g.*, A850-52; *see also* A998/127 ("[E]ven if there is no ultimate harm intended[,] dollar value, it is still a crime if they intend to deprive the victim of potentially economic valuable information.")).  The district court agreed and so instructed the jury.  (A1554-55/2884-88).

Likewise, the government "successfully moved the District Court to exclude certain defense evidence as irrelevant to [the right-to-control] theory."  *Ciminelli*, 598 U.S. at 311.  The defense sought to admit evidence that the developers fully performed their contracts, delivering high-quality buildings on time, on budget, and at a reasonable cost.  The government responded that the developers' performance was "not relevant" in a right-to-control case, and emphasized, "I can be clear this is a case based on a right to control, *not a garden variety*" fraud case. (A1130/808 (emphasis added)).  The district court agreed with the government and excluded Defendants' evidence.  (A1002/143-46, A1130-31/809-11).

6

The government similarly "relied on [the right-to-control] theory in its summation to the jury." *Ciminelli*, 598 U.S. at 311. And, "[c]onsistent with the right-to-control theory, the District Court instructed the jury that the term 'property' in § 1343 'includes intangible interests such as the right to control the use of one's assets.'" *Id.* "Defending the wire fraud convictions [on appeal], the Government relied solely on the right-to-control theory," and this Court "affirmed the convictions based on its longstanding right-to-control precedents." *Id.*

Given the government's sole reliance on the right-to-control theory throughout these proceedings, the Supreme Court declined to "apply [the evidence] to the elements of a *different* wire fraud theory in the first instance" and "affirm [the] convictions on alternative grounds." *Id.* at 316-17. "The right-to-control theory is invalid under the federal fraud statutes," and "[t]hat should be the end of the case." *Id.* Accordingly, the Supreme Court reversed and remanded "for further proceedings consistent with [its] opinion." *Id.* at 317.

The Supreme Court likewise granted the separate petitions for certiorari filed by Defendants Alain Kaloyeros, Steven Aiello, and Joseph Gerardi, vacated their judgments, and remanded for "further consideration in light of *Ciminelli*." *Kaloyeros v. United States*, 143 S. Ct. 2490 (2023); *see also Aiello v. United States*, 143 S. Ct. 2491 (2023).

### C.   The Supreme Court Rejected The Theory Underlying Aiello's Conviction For Honest Services Fraud, Which The Government Agrees Should Be Vacated So That It Can Dismiss That Charge

In a separate decision, the Supreme Court unanimously reversed this Court's ruling affirming Aiello's conviction, following a separate trial, on Count Ten, for conspiracy to commit honest services fraud.  *See Percoco v. United States*, 598 U.S. 319 (2023) ("*Percoco II*"); *see also Aiello*, 143 S. Ct. 2491 (granting Aiello's petition for certiorari, vacating the judgment, and remanding for further consideration in light of *Percoco II*).  All of Aiello's convictions are embodied in a single judgment of conviction.  Accordingly, the government and Aiello have jointly requested that this Court vacate Aiello's conviction on Count Ten and remand to the district court for further proceedings on Count Ten, so that the government can move to dismiss it.  (*See* Dkt. 525).[2]

## ARGUMENT

## I.   DEFENDANTS ARE ENTITLED TO JUDGMENTS OF ACQUITTAL

Based on the right-to-control theory of wire fraud, the district court denied Defendants' motion for a judgment of acquittal, and this Court rejected

---

[2] Gerardi was convicted under 18 U.S.C. § 1001 for statements relating to the Syracuse RFP on which his wire fraud and conspiracy convictions were based. This Court previously declined to consider whether the § 1001 conviction would fail if the wire fraud convictions were reversed, *see Percoco I*, 13 F.4th at 178 n.13, but that issue is now ripe for review given the Supreme Court's decision in *Ciminelli*.  The facts relevant to the § 1001 count are described below in Argument Point II.

Defendants' challenge to the sufficiency of the evidence.  Now that the Supreme Court has held the right-to-control theory legally invalid, Defendants are entitled to judgments of acquittal for two independent reasons.  *First*, because the sole theory charged in the indictment and presented to the jury was legally invalid, the government did not prove a crime at trial.  *Second*, even if the government could pivot to a traditional theory of wire fraud despite its deliberate decision to abandon any such theory before trial, the evidence would be insufficient to sustain the convictions.

## A.    Acquittal Is Required Because The Government Did Not Present Any Legally Valid Theory At Trial

The government "indict[ed], obtain[ed] convictions, and prevail[ed] on appeal based *solely* on the right-to-control theory."  *Ciminelli*, 598 U.S. at 316 (emphasis added).  As a result, the government did not prove wire fraud or wire fraud conspiracy, and Defendants are entitled to judgments of acquittal.[3]

### 1.  *Sufficiency Review Cannot Look Beyond The Theory Charged In The Indictment And Presented At Trial*

When reviewing the sufficiency of the evidence, the Court asks whether a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  This analysis is

---

[3] The conspiracy convictions "stand or fall with the substantive offenses.  If there was property fraud here, there was also conspiracy to commit it.  But if not, not." *Kelly v. United States*, 140 S. Ct. 1565, 1571 n.1 (2020).

9

not, however, divorced from the decision the jury actually rendered. The question is always whether to "uphold the jury's decision," *Burks v. United States*, 437 U.S. 1, 17 (1978)—that is, whether a rational jury could have reached the verdict that this jury reached, given the facts and theories presented to it.

For instance, if the facts presented to the jury are legally insufficient, the government cannot avoid acquittal by showing that facts *not* presented to the jury—whether due to oversight, an adverse evidentiary ruling, or something else—would have tipped the balance. Sufficiency review is based "upon the record evidence adduced at the trial." *Jackson*, 443 U.S. at 324; *see Lockhart v. Nelson*, 488 U.S. 33, 41-42 (1988) (reviewing court considers same "quantum of evidence" as trial court). A rational jury could not have convicted on evidence it never saw, which is why sufficiency review is confined to the evidence presented at trial.

The same is true of legal theories. In reviewing the sufficiency of the evidence, the Court measures the evidence against the theory, or theories, that could have formed the basis for the jury's verdict. Theories the jury did not rely on are irrelevant. In *United States v. Frampton*, 382 F.3d 213 (2d Cir. 2004), for example, one of the defendants (Johnson) was tried on alternate theories: principal liability and aiding-and-abetting liability. *Id*. at 224. The jury convicted him as a principal, as shown on the verdict form, and on appeal this Court refused "to determine whether Johnson's conviction could be supported on an aiding and

10

abetting theory," since "the jury found [him] guilty only on the theory that he acted as a principal." *Id*. Because the evidence was legally insufficient to convict Johnson as a principal, the Court held that he was entitled to a judgment of acquittal. *Id*. at 224-25; *accord United States v. Gonzales*, 841 F.3d 339, 349-50 (5th Cir. 2016) ("sufficiency review" is "limited" to "the jury's chosen theory").

Theories the jury *did not consider* are irrelevant as well. As the Supreme Court emphasized in this case, courts do not "cherry-pick facts presented to a jury charged on [one] theory and apply them to the elements of a *different* … theory." *Ciminelli*, 598 U.S. at 316-17. Thus, a court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury." *Chiarella*, 445 U.S. at 236. Likewise, a court cannot withhold a judgment of acquittal where the verdict was based solely on a legally invalid theory, merely because the government later proffers a different theory, never submitted to the jury, and points to record evidence it claims would satisfy the new theory. In case after case, this Court has refused to expand its sufficiency review to encompass theories the government never presented to the jury:

- In *United States v. Rigas*, 490 F.3d 208 (2d Cir. 2007), after the defendants were convicted of bank fraud, they challenged the sufficiency of the evidence that their misrepresentations were material to the banks' decisions. The Court declined the government's invitation to consider "arguments regarding materiality that were not presented to the jury." *Id.* at 231 n.29; *see also id.* at 235 n.38. Rejecting the new "theory" that "[t]he government did not proffer at trial," the Court found the evidence insufficient as to one count and reversed and remanded for "entry of an acquittal." *Id.* at 236, 239.

11

- In *United States v. Starr*, 816 F.2d 94 (2d Cir. 1987), the Court reversed mail and wire fraud convictions for insufficient evidence because the defendants' customers had "received exactly what they paid for." *Id.* at 99. The Court refused to consider the sufficiency of the evidence to support an alternative "agency theory" that had not been "included in the indictment" or "jury charge" or "argued by the government to the jury." *Id.* at 100.

- In *United States v. Labat*, 905 F.2d 18 (2d Cir. 1990), the Court reversed a drug conviction for insufficient evidence. *Id.* at 22-23. The Court refused to consider the government's new "*Pinkerton* theory," holding that the "theory [wa]s not available on this appeal" because "the jury was not instructed that it could find [the defendant] guilty … on this basis." *Id.* at 23.

- In *United States v. Bouchard*, 828 F.3d 116 (2d Cir. 2016), the Court "reject[ed] the Government's argument" that it should consider a new "theory of [the defendant]'s knowledge" that was "never presented … to the jury." *Id.* at 127. Finding the evidence insufficient to support the theory advanced at trial, the Court reversed the conviction. *Id.* at 127-29. The Court remanded only for resentencing on a different, surviving count—*not* a new trial on the government's new theory. *Id.* at 129.

This rule has a corollary: Sufficiency review is necessarily confined to the theory or theories charged in the indictment. "[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him." *Stirone v. United States*, 361 U.S. 212, 217 (1960). Likewise, a court cannot sustain a conviction against an insufficiency challenge based on a theory not charged in the indictment. To do so would violate both the defendant's Fifth Amendment grand-jury-indictment right and his Sixth Amendment right to be informed of the nature and cause of the accusation. *See*, *e.g.*, *Russell v. United States*, 369 U.S. 749, 760-61, 768-71 (1962). Thus, in reviewing the sufficiency of the evidence supporting a conviction, courts ignore uncharged theories:

12

- In *Eaton v. City of Tulsa*, 415 U.S. 697 (1974) (per curiam), the defendant was convicted for contempt under an information that charged him with "insolent behavior during open court," "to wit: by using the language 'chicken-shit'" to describe someone who assaulted him. *Id.* at 697-98. The state appellate court affirmed his conviction based on his "'discourteous responses' to the trial judge" in addition to his "use of th[is] expletive." *Id.* at 698. The Supreme Court reversed, holding that (i) the conviction could not be affirmed "upon a charge not made" and (ii) focusing on the charge in the information, the "single isolated usage" of the expletive was insufficient to "support the conviction of criminal contempt." *Id.* at 698-700; *see also id.* at 701 (Rehnquist, J., dissenting) (summarizing holding).

- In *Dunn v. United States*, 442 U.S. 100 (1979), the defendant was indicted for making false declarations under oath, based on the inconsistency between his grand jury testimony in June and his later recantation in a sworn statement given at an attorney's office in September. *Id.* at 102-04. The Tenth Circuit affirmed his conviction on the ground, not charged in the indictment, that his testimony at an evidentiary hearing in October was inconsistent with his grand jury testimony. *Id.* at 104-06. The Supreme Court reversed, holding that (i) the conviction could not be affirmed based on the uncharged October testimony and (ii) the charged September statement did not meet the requirements of the statute. *Id.* at 106-13.

- In *United States v. Concepcion*, 983 F.2d 369 (2d Cir. 1992), the defendant was charged with violating a provision of the VICAR statute that offers two possible theories of liability, but "the indictment alleged only" one of the two theories. *Id.* at 384. Citing *Dunn*, the Court noted that although the evidence appeared sufficient to support the uncharged theory, the Court was "constrained by th[e] allegations" in the indictment. *Id.* It affirmed the conviction only after determining the evidence was sufficient to support the charged theory. *Id.*

In sum, a conviction cannot survive sufficiency review, and the defendant must be acquitted, unless the evidence supports a valid theory of liability that was charged in the indictment and presented to the jury at trial. *See also United States v. Aleynikov*, 676 F.3d 71, 75-76 (2d Cir. 2012) (reversing convictions where

theories charged in indictment were "legally insufficient" under the applicable statutes); *United States v. Aleynikov*, No. 10-cr-96 (DLC), ECF No. 164 (S.D.N.Y. June 5, 2012) (Judgment of Acquittal entered on remand).

Relying on *Musacchio v. United States*, 577 U.S. 237 (2016), the government urged the Supreme Court to review the evidence in this case under a "traditional" theory of property fraud, "absent the right-to-control lens." *Ciminelli* U.S. Br., at 12, 31-32. But the Supreme Court rejected the government's invitation, *see Ciminelli*, 598 U.S. at 316-17, and this Court should too.

As the Supreme Court observed in another context, "*Musacchio* did not address—much less resolve in the Government's favor—the 'point now at issue.'" *Van Buren v. United States*, 141 S. Ct. 1648, 1660 (2021). *Musacchio* does not allow the government to shift to an entirely different legal theory on appeal. It merely holds that "when a jury instruction … incorrectly adds one more element [than required], a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Musacchio*, 577 U.S. at 243. That holding is irrelevant, because Defendants are not arguing that the government failed to prove an element not actually required by the wire fraud statute. The required elements will do—but in evaluating whether the government's proof satisfied those elements, Supreme

14

Court and Circuit precedent require the Court to consider only the theory charged in the indictment and presented to the jury at trial.

*2. Defendants Are Entitled To Acquittal*

Measuring the theory the government submitted to the jury against the correct elements of the offense, the conclusion is inescapable:  The government failed to prove wire fraud.

To establish wire fraud, "the Government must prove not only that [the] defendants 'engaged in deception,' but also that money or property was 'an object of their fraud.'"  *Ciminelli*, 598 U.S. at 312 (quoting *Kelly*, 140 S. Ct. at 1571). Here, the sole theory of "property" charged in the indictment and presented to the jury was the "right-to-control theory."  *Id.* at 310-11 & n.1, 316-17.  Under that theory, "potentially valuable economic information" is the protected "property interest."  *Id.* at 309, 313.  Thus, at trial, the government undertook to prove that "defendants deprived Fort Schuyler of 'potentially valuable economic information.'"  *Percoco I*, 13 F.4th at 171.  But as the Supreme Court later held, "potentially valuable economic information" is "not a … property interest" for purposes of the wire fraud statute.  *Ciminelli*, 598 U.S. at 309, 316.  In other words, the government might have proved something, but what it proved was not wire fraud.  Defendants are therefore entitled to a judgment of acquittal, regardless of any new theories of liability the government may try to advance at this stage.

15

This Court's decision in *United States v. Schwartz*, 924 F.2d 410 (2d Cir. 1991), is particularly instructive. There, the trial court denied the defendants' motion for acquittal, ruling that "the government had an intangible … interest in the export licenses it issued," but this Court concluded that "[wa]s not a property interest within the meaning of the wire fraud statute." *Id.* at 417-18. On appeal, the government offered an "alternative … property theory" to try to salvage the convictions, but this Court "refuse[d] to consider th[at] argument because the district court did not instruct the jury on this theory," and "[t]he jury therefore could not have based its verdict on the alternative … property theory." *Id.* at 418. Accordingly, the Court reversed those wire fraud convictions for insufficient evidence, and remanded only for resentencing on the surviving counts. *Id.* at 417-19, 426.

Like the reversed counts in *Schwartz*, the wire fraud charges in this case are at an end. "[O]nce the reviewing court has found the evidence legally insufficient, the only 'just' remedy available for that court is the direction of a judgment of acquittal." *Burks*, 437 U.S. at 18. "[T]he prosecution cannot complain of prejudice, for it has been given one fair opportunity to offer whatever proof it could assemble." *Id.* at 16. The government knew, from the time of Defendants' motions to dismiss, that Defendants challenged the validity of the government's theory of property. When it superseded to switch to the right-to-control theory

16

while those motions were pending, it could have charged traditional fraud in the alternative. And it could have presented both theories at trial. For its own strategic reasons, it chose not to, and specifically disavowed any reliance on a "garden variety" fraud theory (A1130/809): The government excised the charge that Defendants schemed to defraud Fort Schuyler "in its award of significant taxpayer-funded development contracts" from the operative indictment (SAR-23; *see also* SAR-24, SAR-27), and instead "relied solely on the theory that the scheme 'defrauded Fort Schuyler of its right to control its assets,'" *Ciminelli*, 598 U.S. at 310 n.1 (quoting A952).[4] It may not seek a do-over now. "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." *Burks*, 437 U.S. at 11. "Having received 'one fair opportunity to offer whatever proof it could assemble,' the [government] is not entitled to another." *Bullington v. Missouri*, 451 U.S. 430, 446 (1981) (quoting *Burks*, 437 U.S. at 16).

---

[4] This is not a situation where the government merely failed to raise a particular legal theory. Rather, this is a waiver—a situation where the government "intentional[ly] relinquish[ed]" and "abandon[ed]" that theory. *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

**B.    The Evidence Is Insufficient Even If Measured Under A Traditional Property Fraud Theory**

Even if the Court were to assess sufficiency against a traditional property fraud theory, a judgment of acquittal would be required because the government failed to prove an essential element—that Defendants sought to "rip off" Fort Schuyler.

To establish liability for mail or wire fraud, the government must prove "'that the defendant contemplated or intended some harm to the property rights of the victim.'" *United States v. Parse*, 789 F.3d 83, 121 (2d Cir. 2015) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)).  In other words, the alleged schemers must intend to cause "loss to the victim." *Kelly*, 140 S. Ct. at 1573.  Here, however, there was no evidence any Defendant intended to overcharge for his company's services or provide less than what Fort Schuyler paid for.  Indeed, the government did not even try to prove that Defendants' object was to cheat Fort Schuyler out of money.  Instead, it insisted that under the right-to-control theory such proof was unnecessary and sought and obtained a jury instruction that proof of intent to cause Fort Schuyler "to enter into a transaction without potentially valuable economic information" would suffice.  (A982).

In the Supreme Court, the government suggested an alternate basis for affirmance.  It argued, for the first time, that if a defendant lies to induce a victim to transact and pay money, that establishes a property fraud scheme *even if* "he

18

provides consideration in return" for the money. *Ciminelli* U.S. Br., at 11. Thus, according to the government, "the fraud statute does not require proof that the defendant caused *or intended to cause* [financial] harm." *Id.* (emphasis added); *accord*, *e.g.*, *id.* at 20-23.

The problem with that argument—apart from the government's having expressly jettisoned any traditional fraud theory—is that it is squarely foreclosed by long-settled law in this Circuit.

### 1. Wire Fraud Requires Proof That The Defendant Intended To Inflict Economic Harm

For at least the past half-century, the law in this Circuit has been clear: Deceit intended only to induce a commercial transaction, without more, is insufficient to establish a property fraud scheme. To establish fraudulent intent under a traditional property fraud theory, the government must "prove that defendants *contemplated* some actual harm or injury to their victims." *Starr*, 816 F.2d at 98. Thus, if the defendant intends an exchange of fair value in a completed transaction, such that the victim receives what it paid for, that is not property fraud.

These fundamental principles trace their roots to two seminal decisions, *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970), and *Starr*. In *Regent Office Supply*, the defendants sold stationery supplies. Their salesmen induced potential customers to purchase the goods using various lies (*e.g.*, claiming they had been referred by the customer's friend, or that the stationery had

19

to be disposed of because of a friend's death).  The principal issue was whether "solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, constitutes a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of 18 U.S.C. § 1341."  421 F.2d at 1179.  The Court held "it does not" and reversed the convictions.  *Id.*

Key was the lack of evidence that the salesmen "made any false representations regarding the quality or price of their … merchandise," or any false "suggestion of material benefits which the customer might expect from the transaction beyond the inherent utility of the goods purchased and the discount price at which they were offered."  *Id.* at 1180.  Although the government is not required to prove "that purchasers were in fact defrauded," the Court explained, "this does not mean that the government can escape the burden of showing that some actual harm or injury was contemplated by the schemer."  *Id.*  While the scheme need not succeed, "the purpose of the scheme must be to injure."  *Id.* at 1181.

Thus, the fact that "the customers were induced to part with their money because of the false representations" is insufficient to prove a fraud scheme:  "[A]n intent to deceive, and even to induce, may have been shown; but this does not, without more, constitute the 'fraudulent intent' required by the statute."  *Id.*

20

Without "proof that the defendants expected to get 'something for nothing,' or that they intended to get more for their merchandise than it was worth to the average customer," there is insufficient evidence of "any intent to injure or to defraud." *Id.*

The Court reinforced this critical distinction between mere fraudulent inducement and the intent to harm required by the property fraud statutes in *Starr*. There, the operators of a mailing service engaged in a scheme to bury higher postage rate mail inside bulk mail sacks, which enabled them to pay less to the Postal Service than they should have. The defendants misrepresented to their customers that the legally correct postage had been paid, but the customers received all the services for which they had paid the defendants. Thus, the Court held, "there was insufficient evidence that the object of the [defendants'] scheme was to defraud their ... customers." *Starr*, 816 F.2d at 98.[5]

Following *Regent Office Supply*, the *Starr* Court reasoned that the government "must, at a minimum, prove that defendants *contemplated* some actual harm or injury to their victims." *Id.* The Court explained that in *Regent Office Supply*, the lies "were only collateral to the sale and did not concern the quality or nature of the goods being sold" and, "therefore, did not go to the basis of the customers' bargain with the salesmen." *Id.* Because the "customers received

---

[5] The scheme did defraud the Postal Service, but the government had charged only a scheme to defraud the customers.

exactly what they paid for and no customer testified that he had been cheated," there was no violation of the statute. *Id.*

*Regent Office Supply* thus "identifies an important distinction"—mere deceit is "insufficient to maintain a mail or wire fraud prosecution. Instead, the deceit must be coupled with a contemplated harm to the victim" which "affect[s] the very nature of the bargain itself." *Id.* And this requires a showing that the defendants "*intended* … to cause direct pecuniary harm to their alleged victims." *Id.* at 100. Because there was no evidence of "tangible injury" from which the jury could infer an intent to defraud, the evidence was insufficient. *Id.* at 101.

In short, even though the government does not have to show that a fraud scheme is successful—since the statute targets the inchoate scheme—it does have to prove that *if* the scheme were to succeed, it would result in some economic harm to the purported victim.

This Court has reaffirmed that holding of *Regent Office Supply* and *Starr* in numerous subsequent decisions. For instance, in *United States v. Mittelstaedt*, the Court "disagree[d]" with the government's contention that "it does not matter whether the [victim] would have suffered some economic loss if the scheme had been successful." 31 F.3d 1208, 1217 (2d Cir. 1994); *see also id.* (fraud requires proof that deceit "can or does result in some tangible harm"). Likewise, in *United States v. Novak*, the Court found insufficient evidence of intent to defraud because,

22

"as in *Starr*, the [alleged victims] received all they bargained for, and [the defendant's] conduct did not affect an essential element of those bargains." 443 F.3d 150, 159 (2d Cir. 2006). And in *United States v. Shellef*, the Court again held that it is not enough to "induce[] [the alleged victim] to enter into a transaction it would otherwise have avoided." 507 F.3d 82, 109 (2d Cir. 2007). "As in *Starr*," the indictment did not allege "that there was a 'discrepancy between benefits reasonably anticipated' and actual benefits received." *Id.* "And as in *Regent Office [Supply]*," the indictment "fail[ed] to allege" that the defendant "misrepresented 'the nature of the bargain.'" *Id.* Accordingly, the indictment was insufficient to state a wire fraud offense. *Id.*

These precedents are fully consistent with the Supreme Court's decisions interpreting the property fraud statutes. In *Kelly*, for example, the Court held that "*loss* to the victim" must be "an 'object of the fraud.'" 140 S. Ct. at 1573 (emphasis added). As the Court explained, a scheme intended to cause "economic loss to a city" would be "sufficient to meet the federal fraud statutes' property requirement," but if such loss was merely "an incidental byproduct" of the schemers' plans, "a property fraud conviction cannot stand." *Id. See also*, *e.g.*, *Pasquantino v. United States*, 544 U.S. 349, 356 (2005) (scheme constituted mail fraud in part because it "inflict[ed] an economic injury" on victim); *Skilling v. United States*, 561 U.S. 358, 400 (2010) (property fraud involves schemes where

23

"the victim's *loss* of money or property supplie[s] the defendant's gain") (emphasis added); *Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (mail fraud requires the "wrongful purpose of injuring one in his property rights").

Nor is this Court alone in holding that when the putative "victim" receives the benefit of the bargain in a completed transaction, there is no property fraud. Other Circuits, both before and after *Ciminelli*, have reached the same conclusion—often relying on this Court's precedents. *See*, *e.g.*, *United States v. Guertin*, 67 F.4th 445, 451 (D.C. Cir. 2023) ("If an employee's untruths do not deprive the employer of the benefit of the bargain, the employer is not meaningfully defrauded of 'money or property' when it pays the employee his or her salary.") (citing *Shellef*); *United States v. Miller*, 953 F.3d 1095, 1101-03 (9th Cir. 2020) (property fraud requires scheme to "deceive *and* cheat") (citing *Regent Office Supply* and *Starr*); *United States v. Takhalov*, 827 F.3d 1307, 1313-14 (11th Cir. 2016) (where "defendant lies about something" other than price or characteristics of goods, "he has not lied about the nature of the bargain, has not 'schemed to defraud,' and cannot be convicted of wire fraud on the basis of that lie") (citing *Regent Office Supply*, *Starr*, and *Shellef*); *United States v. Sadler*, 750 F.3d 585, 590-92 (6th Cir. 2014) (reversing wire fraud conviction where defendant's lies induced sale but did not deprive victims of property because defendant "paid the … asking price").

24

2.  *There Was No Evidence That Defendants Intended Harm To Fort Schuyler's Property Interests*

Applying the principles set forth above, the government's case plainly fell short.  The alleged deceit occurred when Fort Schuyler was attempting to identify "preferred developers" in Buffalo, Syracuse, and other regions who would be qualified to build potential projects.  The government alleged that Defendants deceived Fort Schuyler about whether the "preferred developer" process was competitive.  This deception, according to the government, induced Fort Schuyler to identify Defendants' companies as "preferred developers" and later enter contracts with them to build facilities in Buffalo and Syracuse.  But, as explained below, there was no evidence of any intent to deceive regarding "the quality, adequacy or price of [services] to be sold." *Regent Office Supply*, 421 F.2d at 1179.  Nor was there any evidence suggesting Fort Schuyler did not "receive[] exactly what [it] paid for." *Starr*, 816 F.2d at 99.  Accordingly, the government failed to prove anything more than mere inducement by deceit, which is insufficient.

In its earlier decision, this Court concluded that Fort Schuyler did not "receive[] the benefit of its bargain" because "[t]he bargain at issue was not the terms of the contracts ultimately negotiated, but instead Fort Schuyler's ability to contract in the first instance, armed with the potentially valuable economic information that would have resulted from a legitimate and competitive RFP

25

process." *Percoco I*, 13 F.4th at 172. The Supreme Court held, however, that this "bargain" did not involve any property interest protected by the wire fraud statute. *Ciminelli*, 598 U.S. at 316-17.

Thus, the only "bargain" that involved any cognizable property interest was the one written into the "terms of the contracts ultimately negotiated" by Fort Schuyler. *Percoco I*, 13 F.4th at 172. Indeed, in its brief to the Supreme Court, the government claimed the property interest at issue was the "contract funds." *Ciminelli* U.S. Br., at 11. Accordingly, unless Fort Schuyler was denied the benefit of its bargain under the construction contracts, the evidence is necessarily insufficient to prove a wire fraud scheme.

And it is undeniable that Fort Schuyler *did* receive the benefit of that bargain. The government did not even try to prove that Defendants defrauded Fort Schuyler during the contract negotiations, or that, in performing the contracts, they overcharged or failed to deliver. (A997/123-25, A1000/137, A1002/145, A1130/807-08). Instead, the government made "clear" to the district court that "this is a case based on [the] right to control, not a garden variety [fraud case]." (A1130/808). The government made this concession because the bargain struck in the contracts was an exchange of construction services for money. Its terms did not include the existence of a "competitive RFP process," or whatever else Fort Schuyler supposedly lost due to Defendants' conduct.

26

Indeed, the developers and Fort Schuyler expressly agreed that the *final* development contracts set forth their entire bargain.  (SAR-54 § 7 ("The parties acknowledge that the Agreement integrates all prior understandings and representations of the parties, and sets forth the entire agreement and understanding of the Parties …."), SAR-76 § 11.1 (listing "the Contract Documents" that "form the entire Contract by and between" the parties), SAR-80 § 23.1) ("The Contract … represents and embodies all the agreements and negotiations between the Parties hereto on the subject matter hereof ….")).  And those final contracts are clear that the bargain struck is money for construction services.[6]  The contracts do not even mention the process through which the developers were selected, much less include any material term related to that process.  (SAR-46-81).

It is thus beside the point that the preliminary Memoranda of Understanding (MOUs) and Notices to Proceed (NTPs) signed by the parties briefly allude to the developers' selection through a "competitive" process.  *Percoco I*, 13 F.4th at 172

---

[6] *E.g.*, SAR-46 § 1 ("COR shall exercise COR's best skill and judgment in furthering the interests of FSMC; to furnish efficient design and construction, construction administration, management services and supervision; to furnish at all times an adequate supply of workers and materials; and to perform the work for the Project in an expeditions and economical manner consistent with FSMC's interests."), SAR-61 § 1.1 (LPCiminelli "agrees to furnish or cause to be furnished project design and construction services, and project management, administration and superintendence and to furnish at all times an adequate supply of workmen and materials and to perform the Work as set forth in this Agreement.").

n.9.  The MOUs and NTPs were not incorporated into the construction contracts.

And even in the MOUs and NTPs, the references to a "competitive" selection

process appeared only in factual recitals and "whereas" clauses that described the

historical background of the parties' relationship (A1809; SA-766, SA-780, SA-

788)—not the "terms and conditions" or "mutual promises" that bound the parties

and defined their obligations (A1810, SA-766-67, SA-780, SA-789).  Prefatory

material of this sort "cannot create any right beyond those arising from the

operative terms of the [contract]."  *United States v. Hamdi*, 432 F.3d 115, 123 (2d

Cir. 2005); *accord Aramony v. United Way of Am.*, 254 F.3d 403, 413 (2d Cir.

2001); *Abraham Zion Corp. v. Lebow*, 761 F.2d 93, 103-04 (2d Cir. 1985);

*Genovese Drug Stores, Inc. v. Conn. Packing Co.*, 732 F.2d 286, 291 (2d Cir.

1984).  Indeed, the references to a competitive process were interspersed among

other recitals praising the work and vision of Governor Cuomo, Fort Schuyler, and

their state university partners, which plainly could not and did not create any

property rights.[7]  The operative terms of the final contracts, by contrast, envisioned

---

[7] *E.g.*, A1808 ("New York State … under the leadership of Governor Andrew
Cuomo has led the U.S. in multi-billion dollar strategic investments in high
technology programs …."), A1809 (SUNY's "C[ollege of] N[anoscale]  S[cience
and] E[ngineering] is a critical enabling component in maintaining and bolstering
NYS' position as a leader in nanotechnology.  CNSE has leveraged the experience
it has obtained from its success in nano-electronics …."); SA-779-80 (same), SA-
766 ("CNSE, with FSMC … is establishing … a first of its kind accredited Film
Nano-School ….").

an exchange of construction services for payment, which the parties faithfully executed.

In sum, Fort Schuyler's "defeated expectation[s]" about the selection process did "not affect the nature or quality of the services" rendered under the construction contracts, and Fort Schuyler could not "legally claim" any injury under those contracts. *Starr*, 816 F.2d at 99-100. As in *Starr*, there was no evidence Defendants intended to deprive Fort Schuyler of any property interest, and an essential element of wire fraud was lacking. Defendants are entitled to a judgment of acquittal.

### 3. The Theoretical Possibility That Fort Schuyler Could Have Gotten A Better Deal Is Insufficient To Establish A Wire Fraud Scheme

The government cannot avoid acquittal by arguing that Defendants intended to deprive Fort Schuyler of a better deal. In its initial decision, this Court acknowledged that "the government offered little evidence that other companies would have successfully bid for the projects and then either charged less or produced a more valuable product absent the fraud." *Percoco I*, 13 F.4th at 172. The Court indicated the most that could be said was that Fort Schuyler "*might* have selected a preferred developer who could offer more favorable economic terms for development contracts." *Id.* at 172 n.8 (emphasis added).

Even if this hypothetical risk of harm would be sufficient under the right-to-control doctrine, it does not establish contemplated harm to a traditional property

interest. Under the right-to-control theory, the fraud entails depriving a counterparty of potentially valuable economic information, so a mere risk of economic harm could show that the withheld information was *potentially* economically valuable. *See United States v. Finazzo*, 850 F.3d 94, 111-12 (2d Cir. 2017). Following *Ciminelli*, however, hypothesizing theoretical risks is insufficient. Instead, the government must actually prove that Defendants intended to rip off Fort Schuyler.

This is consistent with this Court's decisions defining traditional property fraud. Whenever a party is deceived into entering a transaction, but gets exactly what it paid for, there is a risk that, but for the deception, it might have gotten a better deal somewhere else. Indeed, that was true in cases such as *Regent Office Supply*, *Starr*, and *Shellef*, yet this Court asked only whether the purported victim got what it bargained for, not whether it got the most optimal deal imaginable. And, as explained, this Court has repeatedly held that the government must prove that if the fraud were completed, it would have caused the alleged victim some pecuniary harm. *See* Point I.B.1 *supra*. Here, of course, the "scheme" was completed because the parties engaged in transactions, and Defendants' companies got paid to perform services, but there was no proof whatsoever that Fort Schuyler suffered any loss. Indeed, the government did not even try to prove any such harm.

30

Similarly, because proof of "fraudulent intent" is required, "[i]t is not sufficient that [the] defendant realizes that the scheme … has the capacity to cause harm." *Guadagna*, 183 F.3d at 129. Rather, "the defendant must intend to harm the fraud's victims." *United States v. D'Amato*, 39 F.3d 1249, 1257 (2d Cir. 1994); *accord Starr*, 816 F.2d at 98 ("Only a showing of intended harm will satisfy the element of fraudulent intent."); *Regent Office Supply*, 421 F.2d at 1181 ("[T]he purpose of the scheme must be to injure …."); *see also Kelly*, 140 S. Ct. at 1573 ("loss to the victim" must be "an 'object of the fraud'").

Even if the evidence suggested Defendants theoretically "might" have deprived Fort Schuyler of a better deal, *Percoco I*, 13 F.4th at 172 n.8, that would fall far short of showing that Defendants intended to cause harm. A theoretical possibility of harm would not even prove Defendants acted "recklessly," because "recklessness" entails the "deliberate decision to endanger another" with "awareness of the[] *substantial* risk of causing injury." *Voisine v. United States*, 579 U.S. 686, 694 (2016) (emphasis added). A theoretical possibility is not a "substantial risk." And "recklessness," of course, is a lower standard. It does "not suffice" to prove the "specific intent," *United States v. Kwong*, 14 F.3d 189, 195 (2d Cir. 1994), required for the "specific intent crimes" of mail and wire fraud. *United States v. Regan*, 937 F.2d 823, 827 (2d Cir. 1991).

31

In sum, any harm to Fort Schuyler was *entirely* theoretical and speculative, and therefore cannot support the convictions under a traditional property fraud theory. *See*, *e.g.*, *Novak*, 443 F.3d at 159 ("hypothetical contention" that alleged victims would have paid less had they known the truth was "inadequate"); *Starr*, 816 F.2d at 99-100 ("metaphysical" harm insufficient). As this Court has emphasized, even "reasonable speculation … is an insufficient basis on which to rest a guilty verdict." *United States v. Pauling*, 924 F.3d 649, 660 (2d Cir. 2019); *see also*, *e.g.*, *United States v. Coplan*, 703 F.3d 46, 76 (2d Cir. 2012) ("A conviction based on speculation and surmise alone cannot stand."). Consequently, Defendants are entitled to acquittal even if Fort Schuyler "might" have obtained a better deal.

*　　*　　*

There was no evidence from which a reasonable jury could have found beyond a reasonable doubt that Defendants intended to cause Fort Schuyler any pecuniary harm. The wire fraud and conspiracy convictions must therefore be reversed with instructions to enter a judgment of acquittal.

## II.  GERARDI'S FALSE STATEMENT CONVICTION SHOULD BE REVERSED

The Court should also reverse Joseph Gerardi's parallel conviction under 18 U.S.C. § 1001 for alleged false statements about tailoring the Syracuse RFP. For starters, Gerardi's suggested edits to the draft RFP would have *broadened* the RFP

32

so other developers would also qualify, just as Gerardi told the prosecutors. But in any case, the statements were immaterial to the government's investigation as a matter of law in light of *Ciminelli*.

At a minimum, the § 1001 conviction should be vacated due to the prejudicial spillover from the flawed wire fraud and conspiracy counts, which dominated the trial as the government presented extensive inflammatory evidence about the Buffalo RFP—which had nothing to do with Gerardi. The government lumped Defendants together as purported "fraudsters" and "liars" for the alleged conspiracy and urged the jury to treat the § 1001 count as part of the larger "fraud." Under these circumstances, no jury could have fairly evaluated the false statement charge independent of the alleged wire fraud. Gerardi was thus deprived of a fair trial on the false statement charge.

## A. Background

In June 2016, after receiving a grand jury subpoena, Gerardi voluntarily agreed to be interviewed by the U.S. Attorney's Office. (SA-900-01). By that point the government's investigation was nearly over; prosecutors and FBI agents had conducted many interviews and obtained a wealth of documentary evidence, including Gerardi's emails. (*See*, *e.g.*, SA-899-900; A1328-29/1695-99). The criminal complaint issued just three months later. (A19).

33

Much of the proffer session centered on handwritten notes Gerardi made on a draft Syracuse RFP on which COR's consultant had asked him to comment. (A1650-64/GX606).  COR was able to satisfy most, if not all, the requirements in the draft:  It had the requisite years of development experience and the right kind of experience, utilized the required software applications, could obtain a performance bond, and could supply audited financial statements.  (A1098-99/536-37, A1328/1695, A1420-21/2210-11).  Nonetheless, Gerardi suggested *broadening* the requirements so other developers—not just COR—would qualify.  For instance, his handwritten comments proposed reducing the number of years' experience required, expanding the types of experience considered relevant, removing any requirement of specific software programs, forgoing the performance bond requirement, and deleting the requirement of "audited" financial statements, which typically only public and not-for-profit companies would maintain.  (A1655-60; *see also* Aiello Br. (Dkt. 211), at 57).  In his proffer, Gerardi said he was concerned the draft RFP "would preclude other companies from being able to apply."  (A1329/1696; *see* A1328/1694-95).

Nonetheless, Count Sixteen charged Gerardi with falsely "denying involvement in tailoring the Syracuse RFP for the benefit of [COR]."  (A312; *see* A1557/2894 (jury charge)).  During the four-week trial, the government presented myriad evidence related to the wire fraud counts yet called only a single witness,

an FBI agent, to briefly testify about Gerardi's proffer session, in testimony lasting under an hour.  (Tr.1681-1701).  The government presented no evidence that Gerardi's proffer hindered the FBI's investigation; indeed, he was arrested just three months later.  (A1330/1700).  In its summation the government portrayed the proffer session as just another step in the alleged fraud, urging the jury to convict under § 1001 because "Gerardi tried to convince the F.B.I. he had done nothing wrong" and "lie[d] … to the government to get away with fraud."  (A1459/2464, A1473/2527).

### B.    *Ciminelli* **Renders Gerardi's Statements Immaterial**

Section 1001 prohibits "knowingly and willfully … mak[ing] any *materially* false, fictitious, or fraudulent statement or representation" "in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States."  18 U.S.C. § 1001(a)(2) (emphasis added).  A false statement is "material" only if it has "a natural tendency to influence, or be capable of influencing, the decision of the decisionmaking body to which it was addressed." *United States v. Gaudin*, 515 U.S. 506, 509 (1995); *accord United States v. Litvak*, 808 F.3d 160, 170 (2d Cir. 2015).  Consequently, "not every misrepresentation presented to a governmental decisionmaker is inherently 'material.'  A statement might be false, but still incapable of affecting anything."  *United States v. Johnson*, 19 F.4th 248, 258-59 (3d Cir. 2021).

35

Critically, if the government could not have acted on a true statement, then a false statement—even if in some sense "relevant" to the agency—is not "reasonably capable of influencing a decision" and thus not material. *Litvak*, 808 F.3d at 174; *see Kungys v. United States*, 485 U.S. 759, 774 (1988) (false date and place of birth given in naturalization petition not material to INS because unrelated to qualifications for citizenship); *United States v. Facchini*, 874 F.2d 638, 644 (9th Cir. 1989) (en banc) (false statements not material given "limited" federal role in an Oregon state benefits program); *United States v. Qaisi*, 779 F.2d 346, 348 (6th Cir. 1985) (statement not material where misstated fact cannot be basis of agency's decision). The government fails to prove materiality when it fails to establish "an actual decision of the [agency] that was reasonably capable of being influenced by [defendant]'s misstatements." *Litvak*, 808 F.3d at 172; *see United States v. Ismail*, 97 F.3d 50, 60-61 (4th Cir. 1996) (reversing for insufficient evidence where there was no evidence false bank signature card could influence any FDIC decision).

There is no such decision here. Even if Gerardi had admitted tailoring the RFP in his proffer session, his statements were not "reasonably capable of influencing" any prosecutorial decision: As a matter of law, that conduct was not chargeable fraud because *Ciminelli* invalidated the right-to-control theory of wire fraud, and the government couldn't prove traditional property fraud. *See* Point I *supra*. Thus, the alleged misrepresentation about RFP tailoring was immaterial.

*See United States v. Bonds*, 784 F.3d 582, 585 (9th Cir. 2015) (reversing conviction of former MLB player Barry Bonds because, whether or not his statement before the grand jury was false, it "communicate[d] nothing of value or detriment to the investigation" and therefore was immaterial).

Nor did the government attempt to prove that Gerardi's statements could or did impact the government's investigation in any way. Because "[n]either the answer he in fact gave nor the truth he allegedly concealed could have impeded or furthered the investigation," *United States v. Mancuso*, 485 F.2d 275, 281 (2d Cir. 1973), Gerardi's proffer statements were not material, and he is entitled to acquittal on Count Sixteen.

### C. At A Minimum, Spillover Prejudice From The Wire Fraud And Conspiracy Counts Requires Vacating The § 1001 Conviction

In granting Gerardi bail pending appeal, Judge Caproni found there was "a substantial question whether his conviction for false statements would require a new trial, due to the risk of prejudicial spillover from the fraud counts." (A2652). She was right. Spillover prejudice requires a new trial.

Whenever an appellate court reverses convictions as to some counts, it must vacate any remaining conviction unless it can "conclude that [the] conviction … did not result from a spillover from" the reversed counts. *United States v. Rooney*, 37 F.3d 847, 857 (2d Cir. 1994) (vacating § 1001 conviction due to prejudicial spillover); *see United States v. Bruno*, 383 F.3d 65, 91 (2d Cir. 2004) (same). In

37

making that assessment, the Court considers "the totality of the circumstances" with particular focus on three factors: "1) whether the evidence on the reversed counts was inflammatory and tended to incite or arouse the jury to convict the defendant[] on the remaining counts; 2) whether the evidence on the reversed counts was similar to or distinct from that required to prove the remaining counts; and 3) the strength of the Government's case on the remaining counts." *Bruno*, 383 F.3d at 91. Here, those factors—individually and in combination—require vacatur.[8]

1. The wire fraud and conspiracy counts dominated the government's evidence and its arguments to the jury. Of the 15 witnesses the government presented over the four-week trial, only a single one—an FBI agent—offered evidence relating to the § 1001 count, in a mere 21 pages of the nearly 3,000-page trial transcript.

The government used the wire fraud and conspiracy counts to lump all Defendants together—even though Gerardi was not involved in the Buffalo RFP—and to disparage them as fraudsters and liars who took advantage of a non-profit organization. It hammered this theme over and over in its jury arguments:

- "This is a case about lying and cheating" (A1012/37);
- Defendants "lied, cheated, and tricked the non-profit" (A1013/39);

---

[8] *See also* Gerardi Br. (Dkt. 209), at 49-60; Gerardi Reply (Dkt. 267), at 30-36.

- "[T]he reason for all the secrecy, for all the lies … is because the defendants defrauded the SUNY nonprofit and duped it into picking the defendants' companies" (A1015/49);

- "These defendants lied repeatedly and they lied to everyone" (A1459/2464);

- Defendants "lied to Fort Schuyler to get what they wanted. And that's at the heart of the crimes that these defendants are charged with" (A1461/2473);

- "These men did not want to play by the rules. They were not willing to play fair or honest" (A1474/2531).

The government then wove Gerardi's proffer session into this larger narrative of fraud and deceit, telling the jury he "lie[d] … to the government to get away with fraud."  (A1459/2464).

In *Rooney*, this Court concluded that an isolated line in the government's summation was sufficient to "incite or arouse the jury into convicting" on separate § 1001 counts, because the comment had a "decidedly pejorative connotation."  37 F.3d at 856-57.  Here the government's incendiary comments were far more pervasive, smearing not only Gerardi but also those with whom he supposedly associated as deceptive, manipulative, and untruthful.  Once the jury decided to convict on wire fraud and conspiracy counts, it was all but certain they would convict Gerardi on the tag-along § 1001 count as well.

2.  This Court recognizes that "spillover prejudice is likely to occur" when "evidence is introduced on the invalidated count[s] that would otherwise be inadmissible on the remaining count[], *and* this evidence is presented in such a

manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining count[].ʺ  *Id.* at 856.

That is exactly what happened here.  Every count at trial concerned alleged RFP tailoring.  There was no way for the jury to associate certain evidence with certain counts, and other evidence with others.  And the vast majority (including the most inflammatory proof) would have been inadmissible in a trial focused solely on the false statement count.  For instance, there were numerous exhibits and many days of testimony devoted to purported efforts to tailor the Buffalo RFP—which Gerardi had nothing to do with—and far less evidence concerning the Syracuse RFP.  (*See* A1394/2085 (district court acknowledging that the evidence regarding the Syracuse RFP was ʺthinnerʺ than Buffalo)).  This evidence included, among other things, testimony and exhibits about other (non‑Syracuse) Defendantsʹ deleted emails and use of personal email accounts and other services supposedly to avoid detection, and highly inflammatory evidence about certain Defendantsʹ ties to Governor Cuomo.  (*See* Gerardi Br. (Dkt. 209), at 55‑56).

The governmentʹs lengthy presentation of alleged ʺcriminal activities in which [Gerardi] did not participateʺ makes it ʺhighly likelyʺ that that evidence prejudiced him in the eyes of the jury.  *United States v. Tellier*, 83 F.3d 578, 582 (2d Cir. 1996).  In *Bruno*, for example, this Court vacated a § 1001 conviction because of the ʺenormous amount of prejudicial spillover evidence admittedʺ for

40

subsequently reversed RICO counts, "all but a tiny sliver" of which was irrelevant to the false statement count. 383 F.3d at 91; *see also*, *e.g.*, *United States v. Abdelaziz*, 68 F.4th 1, 55-58 (1st Cir. 2023) (in "Varsity Blues" case, finding prejudicial spillover from government's failure to prove a nationwide conspiracy that enabled the jury to impute other parents' misconduct to defendants).[9]

Moreover, as discussed, "the prosecution encouraged the jury to consider the evidence on [the wire fraud and conspiracy counts] as bearing on [Gerardi's] culpability on" the § 1001 count. *Rooney*, 37 F.3d at 856. The government exhorted the jury: "[T]hink about all of these lies, all of the concealment, the destruction of evidence. These defendants lied repeatedly and they lied to everyone." (A1459/2464).

3. The third factor also weighs heavily in favor of vacatur. Not only did the government fail to prove materiality, but also, its proof that Gerardi falsely "den[ied] involvement in tailoring the Syracuse RFP for the benefit of [COR]" was slim at best.

---

[9] The government's claim that all of this evidence would have nonetheless been admitted as context for Gerardi's proffer session (Gov't Br. (Dkt. 238), at 191-92) is nonsensical. No rational judge would have admitted the vast majority of this evidence, particularly the evidence related to the Buffalo RFP and the alleged acts of concealment having nothing to do with the Syracuse RFP. *See United States v. Wright*, 665 F.3d 560, 576 (3d Cir. 2012) (rejecting similar government arguments because "a trial court likely would exclude some of [the evidence] under [FRE] 403 or 404"); *see also* Gerardi Reply (Dkt. 267), at 34-35.

41

There was no evidence Gerardi "denied involvement in tailoring" the RFP; the closest the government came was the FBI agent's claim that Gerardi said "he did not *ask* for the RFP to be tailored." (A1330/1700 (emphasis added)). But that was literally true. Indeed, the district court and the government acknowledged that any tailoring was not done at Gerardi's request. (A2639 (district court stating that "this scheme originated with and was nudged along by Howe"), A2647/16 (government arguing "it was really Kaloyeros's plan to rig these RFPs")).

The agent also recounted statements in which Gerardi indicated that his handwritten comments on the draft RFP were intended to open it up to more bidder-developers, not to favor COR. (*E.g.*, SA-904 ("He also stated that he was trying to make the RFP as broad as possible so that companies would be able to respond"); A1328/1694-95 (Gerardi wrote "too telegraphed" to mean "too telescoped" and stated "he was concerned that it wouldn't be broad enough for other develop[ment] companies to be able to apply")). But this was indisputably true. COR easily could have met the requirements in the draft RFP that Gerardi received. But Gerardi proposed loosening the RFP's requirements—*e.g.*, softening the experience requirements and removing software, performance bond, and audited financial statement requirements (A1655-60)—which on its face would have made the RFP more competitive, less restrictive, and less tailored to COR.

42

And other statements the government emphasized—that Gerardi gave Howe comments on the draft RFP as an attorney and a friend, that he did not know why Howe emailed him about adding a "financial institution reference letter" option (A1458-59/2461-64)—were hardly damning evidence that Gerardi falsely "denied involvement in tailoring" the Syracuse RFP. In short, the evidence pertaining to the false statement charge was far from overwhelming and the jury could easily have convicted him on that count due to the evidence of supposed lies, fraud, and corruption relating to the other counts. Accordingly, Gerardi was deprived of a fair trial on the false statement charge.

## CONCLUSION

The government chose to try these Defendants on a right-to-control theory, which the government subsequently conceded was invalid. When the government decides to charge someone with a crime, it does so knowing the law affords it "one fair opportunity to offer whatever proof it c[an] assemble." *Burks*, 437 U.S. at 16. The government had its opportunity, and it failed to prove guilt under a valid theory of the charged crimes. Defendants are entitled to acquittal on the wire fraud and conspiracy counts.

The Court should also reverse and remand Aiello's honest services fraud conspiracy conviction so that the government can move to dismiss that count. And

it should reverse Gerardi's false statements conviction and remand with

instructions to grant a judgment of acquittal, or at least a new trial on that count.

Dated:     September 8, 2023

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Daniel J. O'Neill
Fabien M. Thayamballi
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas, 17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendants-Appellants*
*Steven Aiello and Joseph Gerardi*

/s/ Spencer L. Durland
Timothy W. Hoover            Herbert L. Greenman
Spencer L. Durland           LIPSITZ GREEN SCIME CAMBRIA LLP
HOOVER & DURLAND LLP         42 Delaware Avenue, Suite 300
561 Franklin Street          Buffalo, New York 14202
Buffalo, New York 14202      (716) 849-1333
(716) 800-2600

*Attorneys for Defendant-Appellant Louis Ciminelli*

/s/ Michael C. Miller
Michael C. Miller            Bruce C. Bishop
Reid H. Weingarten           STEPTOE & JOHNSON LLP
Michael G. Scavelli          1330 Connecticut Avenue N.W.
STEPTOE & JOHNSON LLP        Washington, D.C. 20036
1114 Avenue of the Americas  (202) 429-6747
New York, New York 10036
(212) 506-3900

*Attorneys for Defendant-Appellant Alain Kaloyeros*

## CERTIFICATE OF COMPLIANCE WITH PAGE LIMITATION, TYPEFACE REQUIREMENT, AND <u>TYPE STYLE REQUIREMENT</u>

1.   The undersigned counsel of record for Defendants-Appellants Steven Aiello and Joseph Gerardi certifies that the foregoing brief contains 44 pages and thus complies with the page limit set forth in this Court's Order dated July 10, 2023 (Dkt. 517).

2.   This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point font of Times New Roman.

Dated:    September 8, 2023

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

45